50 CCPA
Timothy G. MEULENBERG and Robert L. Redmond, Appellants,

v.

Robert E. SCOTT, Appellee.

Patent Appeal No. 6832.

United States Court of Customs and Patent Appeals.

March 13, 1963.

Barnes, Kisselle, Raisch & Choate, Detroit, Mich. (John M. Kisselle and Basil C. Foussianes, Detroit, Mich., of counsel), for appellants.

Strauch, Nolan & Neale, Washington, D. C. (James E. Nolan, Washington, D. C., of counsel), for appellee.

Before WORLEY, Chief Judge, RICH and SMITH, Judges, and Judge JOSEPH R. JACKSON, Retired, and Judge WILLIAM H. KIRKPATRICK.[*]

SMITH, Judge.

Appellants, the junior party, have appealed from a decision of the Board of Patent Interferences, adhered to on reconsideration, which awarded priority of invention to the senior party, Scott, on all five counts in interference. Appellants' application[1] for patent was declared to be in interference with a Scott patent[2] from which appellants had copied the claims which became counts 1–4 of this interference. Later the interference was reformed to include Scott's application[3] for reissue of his patent and a claim which became count 5, was copied from the application for reissue, and added to the interference.

The invention in issue relates to improvements in snap fasteners which are used, *inter alia,* to detachably secure trim strips to automobile bodies. In this use, the projecting resilient legs of the fastener project through holes provided in a portion of the automobile body and exert a clamping action between the trim strip, which is engaged by the head portion of the fastener, and the contacting surfaces of the automobile body and the trim strip. The particular improvement here in issue relates to a resilient sealing element on the snap fastener which is effective to provide a water tight plug in the holes in the automobile body when the fastener legs are inserted therein.

Count 1 describes the subject matter of the interference as follows:

"1. A fastening device for removably attaching members together, comprising a snap fastener having a head shaped to provide an open border frame engageable with one member and having a shank joined to and projecting transversely from said head, said shank being positioned substantially centrally of the head for projection through an opening in another member, a resilient body of thermoplastic material having a base surrounded and confined in its entirety by the inner side of said border frame and having the outer side of said base bonded to the inner side of the border frame, said border frame having exposed surfaces projecting laterally outwardly beyond said base for direct engagement with said one member to securely clamp the latter to the other member, said body of thermoplastic material having a portion projecting from said base in the direction of said shank for sealing engagement with the marginal edges of the opening through which the shank is adapted to project, and said portion completely enclosing and bonded to the portion of the shank joined to said head."

The invention, as indicated by the above-quoted count, requires that the snap fastener have a head shaped to pro-

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge MARTIN, pursuant to provisions of Section 294(d), Title 28 United States Code.

1. Ser. No. 185,258, filed Sept. 16, 1950.

2. No. 2,643,433, issued June 30, 1953.

3. Ser. No. 515,570, filed June 14, 1955.

vide an open border frame engageable with a first member (the trim strip, for example) to be fastened to a second member (the automobile body in the example described) and a flexible shank joined to and projecting transversely from the head (the resilient legs) for projection through an opening formed in said second member. The resilient sealing member as called for by count 1, comprises a resilient body of thermoplastic material which has a base surrounded and confined in its entirety by the inner side of the border frame and has, in addition, a portion which encloses and is bonded to the portion of the shank where it joins the head. The resilient sealing member projects from the base in the direction of the shank to provide a portion which enters into and plugs the opening in the said second member through which the shank projects.

The fastener, without the sealing material, was admittedly known before either party claims to have conceived the invention covered by the counts of the interference. It is therefore the resilient sealing element or plug which is the particular feature of the device here in issue. The problem which the device sought to solve is that of the water leakage through the holes in the automobile body which caused rust and corrosion to form rapidly at and adjacent to the fastening holes and permitted water seepage inside the body panels. One attempted prior solution was to have a sealing compound ("dumdum") placed on the spring clips by the production line assemblers before insertion of the clip into the retaining hole. This and other attempted solutions were not satisfactory due to the difficulties in assuring proper application of the sealing material under conditions which prevail on the automobile body assembly lines. The invention defined by the counts herein proposes the use of a pre-formed thermoplastic body which is bonded to the clip so that it could simply and effectively plug the body holes to effect a water-tight seal and thus obviate the unreliable "dumdum" application on the assembly line.

Three issues are presented to us by this appeal:

(1) Was the board correct in holding that none of the counts read on Meulenberg and Redmond's exhibits 1 and 4?

(2) If we find that any of the five counts do read upon these exhibits 1 and 4, was the board correct in holding that the junior party's testimony established a reduction to practice prior to the senior party's filing date?

(3) If the second issue is answered affirmatively, was the board correct in its decision on reconsideration that the senior party's proofs failed to show a reduction to practice of a clip satisfying the counts prior to its filing date, or prior to the junior party's proven reduction to practice?

Both parties took testimony. The testimony on behalf of the junior party, Meulenberg and Redmond, chiefly concerned the development of a satisfactory clip having a soft rubber base. The various witnesses testified that a molding clip of the type shown in Fig. 6 of the junior party's application was successfully produced "in the winter of 1949". These witnesses specifically referred to a clip identical to Meulenberg and Redmond's exhibits 1 and 4. Exhibit 1 was a sample clip and exhibit 4, a production drawing, was related to exhibit 1 by witness Donald Koza as follows:

"Q42. How does Exhibit 1 compare with the drawing, Exhibit 4? A. Well, to my knowledge, I would say this is the 5050 part number, but now without mic-ing [sic] or laying it out, I would say it is the style of button and it is the style of clip that was set up, in my opinion, as this 5050 clip, and the sponge pad, or sponge button is identical with this drawing (indicating)."

A major difficulty to overcome in perfecting the resilient base of thermoplastic material was to develop a sponge rub-

ber of such properties that it would effectively seal the hole in the fender and at the same time not interfere with the gripping action of the prongs. This problem was described by witness Paul Funkhouser who testified for the junior party as follows:

"Q25. Speaking of the harder rubber, you say you made tests on this harder rubber.

"A. Yes.

"Q26. And it did not work.

"A. No, it wasn't satisfactory from the standpoint that in some cases the rubber would not seal the hole, and in other cases it held the molding away from the body.

"Q27. Were those tests on the harder rubber quite extensive?

"A. I would say so, yes. They submitted samples I would say weekly reducing the hardness of the rubber, and we also were experimenting with some sort of sponge rubber that could be applied."

The Board of Patent Interferences held that although the testimony of the junior party was sufficient to show by a preponderance of evidence that it had successfully reduced to practice a clip of the type of exhibits 1 and 4 prior to the senior party Scott's filing date, the board was of the opinion that none of the five counts was readable on a clip of this type and therefore it awarded priority to the senior party Scott. In its decision, the board stated:

"We are of the opinion that the testimony of Funkhouser and Koza prove conception and reduction to practice of the clip of Meulenberg *et al.* Exhibits 1 and 4 in the winter of 1949 which period the witnesses intended to include March 1950. However, we are of the view that none of the counts of the interference is readable on said Meulenberg *et al.* Exhibits 1 and 4. These exhibits do not satisfy 'the language of the counts' quoted hereinabove from the Examiner's decision on the motions with respect to counts 1 to 4,

and count 5 which is the broadest of the five counts, is not satisfied, because these exhibits do not satisfy the limitation of the count 'having a base *surrounded* by said border frame'. To surround, requires enclosing completely, encircling, or encompassing. Partially doing so is not 'surrounding'."

In its decision on reconsideration, the board adhered to its decision and also stated that it was of the opinion that the testimony of the senior party Scott did not establish a reduction to practice of a clip satisfying the counts prior to his own constructive reduction to practice, the filing date of April 13, 1950.

With the foregoing as background, we shall now consider separately each of the three issues here presented in the order previously stated.

(1) WAS THE BOARD CORRECT IN HOLDING THAT NONE OF THE COUNTS READ ON MEULENBERG AND REDMOND'S EXHIBITS 1 AND 4?

The board held that the counts were not readable on Meulenberg and Redmond's exhibits 1 and 4 as follows:

" * * * These exhibits do not satisfy 'the language of the counts' quoted hereinabove from the Examiner's decision on the motions with respect to counts 1 to 4, and count 5 which is the broadest of the five counts, is not satisfied, because these exhibits do not satisfy the limitation of the count 'having a base *surrounded* by said border frame'. To surround, requires enclosing completely, encircling, or encompassing. Partially doing so is not 'surrounding'."

The primary examiner's decision on the motions referred to by the board was a decision denying a motion *by the junior party* to dissolve the interference on the grounds that counts 1 to 4 did not read on the junior party's disclosure.

Exhibit 4, which is a production drawing of the sample clip of exhibit 1, shows three views of a clip similar to that

shown in Fig. 6 of Meulenberg and Redmond's application. The plan view from exhibit 4 and Fig. 6 of the application are reproduced below.

Exh. 4

The portions of counts 1 through 4 which seem to be the most pertinent to a determination of this issue, and count 5 in its entirety are as follows:

*"Counts 1 and 2:*

" * * * a resilient body of thermoplastic material having a base surrounded and confined in its entirety by the inner side of said border frame *and having the outer side of said base bonded to the inner side of the border frame,* * * * [Emphasis added.]

*"Count 3:*

"* * * a body of resilient material having a base and a portion projecting from the central portion of the base in the direction of said shank, said base being surrounded and confined in its entirety by the inner side of said border frame *and having the outer side of said base bonded to the inner side of the border frame,* * * * [Emphasis added.]

*"Count 4:*

" * * * a body of resilient material having a base confined between the inner sides of said frame parts *and having the outer sides of said base bonded to the inner sides of said frame parts,* * * * [Emphasis added.]

*"Count 5:*

"A fastening device for removably attaching members together comprising a snap fastener having a head shaped to provide an open border frame engageable with one member and having a shank joined to and projecting transversely from said head, said shank being positioned for projection through an opening in another member, *a resilient body of soft deformable plastic material having a base surrounded by said border frame,* said border frame having exposed surfaces laterally outwardly of said base for direct engagement with said one member to securely clamp the latter to the other member, said body of plastic material having a portion projecting from said base in the direction of said shank for sealing engagement with the marginal edges of the opening through which the shank is adapted to project, and said portion completely enclosing and bonded to the portion of the shank joined to said head. [Emphasis added.]"

We think the board was correct in holding that counts 1 through 4 do not claim a clip of the type illustrated and shown by exhibits 1 and 4. Each of the

four counts requires the outer side of the base of the body of resilient material, (i. e., the base of the sponge rubber plug), to be "bonded to the inner side of the border frame." As is apparent from the above-reproduced drawings, it cannot be reasonably said that the outer side of base 82 is bonded to the inner side of the frame 70 in Fig. 6 of the application. The outer side of the base touches the inner side of the border frame at only two points. There is no "bond" specifically at these points since the base of the resilient member is molded around the bent up portions 78, 78 of the border frame and is not bonded to the inner sides of the border frame. The language of the counts, reasonably interpreted, requires that the outer side of the base be bonded to the inner side of the border frame throughout or substantially throughout its periphery, not just touching at two points. We hold, therefore, that counts 1 through 4 are not supported by Meulenberg and Redmond's exhibits 1 and 4.[4]

The board correctly held that the evidence of the junior party did not establish a reduction to practice of a clip of the type of Meulenberg and Redmond's exhibit 10, which type of clip would meet the limitations of counts 1–4, inclusive, as well as the broader count 5.

█ Count 5 is the broadest of the counts and has no such limitation as we have found in counts 1 to 4, inclusive. However, in its decision on reconsideration, the board said:

"* * * In count 5, it is recited that the base is 'surrounded by the

border frame'. This may be said to be substantially true of a structure such as Meulenberg *et al.* Exhibit 10, wherein the border and the base are in substantially the same plane, but it is not true of a structure such as Meulenberg *et al.* Exhibits 1 and 4 wherein the base and the border have only a portion thereof in the same plane and wherein on one side the base extends substantially beyond the 'border' and the opposite side of the border is substantially above the base (when the fastening device shank is held vertically and projecting downwardly). As a result only about half of the base is enclosed by the border. We do not believe that this satisfies the requirement of the verb 'surround', which we believe requires to encircle, enclose around, encompass, or shut in on all sides."

It is the position of the board, therefore, that the frame must "surround" the base in all planes, as a sphere surrounds its center. We do not agree with this interpretation. As shown in the plan view of exhibit 4 reproduced above, the round base lies entirely [5] inside the border frame in the plane of this page. We do not think that the verb "surround", in its normal usage,[6] requires that the surrounded object be enclosed in all planes as required by the board. In interpreting this count as broadly as its language will reasonably permit, In re Hollman, 213 F.2d 323, 41 CCPA 937, we think a reasonable interpretation of the verb "surround" here is that of encompassing the resilient body within a

---

4. In the decision of the Primary Examiner on the motion to dissolve, the Examiner stated that the clip shown in Fig. 7 of the Meulenberg and Redmond application satisfies the limitations of the counts. Since the embodiment of Fig. 7 is unlike that of exhibits 1 and 4 in that the base of the former contacts its frame at four points, our decision is not inconsistent with that of the Primary Examiner.

5. A small bottom portion of the base protrudes slightly below the frame members as they turn inwardly. The board did

not regard this protrusion as significant and we do not so regard it. A line extended along the straight sides of the bottom of the border frame in the plan view of exhibit 4 above would complete the "surrounding" of this small portion.

6. "*Surround:* 1. To enclose on all sides; encompass. 2. To encircle; as a wall *surrounds* the city. 3. *Mil.* To enclose as a body of troops, so as to cut off communication or retreat; to invest, as a city." (Webster's New Collegiate Dictionary, 1961, p. 855).

given plane,[7] in the same sense Custer was "surrounded" by Indians or that a moat "surrounds" a castle. While we agree with the board that express limitations in the counts cannot be ignored, we think that the board has unduly limited the common meaning of the verb "surround". We hold, therefore, that count 5, construed as broadly as the language therein will reasonably permit is supported by exhibits 1 and 4 of Meulenberg and Redmond.

(2) DOES THE TESTIMONY OF MEULENBERG AND REDMOND ESTABLISH A REDUCTION TO PRACTICE OF A DEVICE DEFINED BY COUNT 5 PRIOR TO SCOTT'S FILING DATE OF APRIL 13, 1950?

The junior party's evidence consists of the testimony of six witnesses and a number of documentary exhibits. All the testimony, with the exception of rebuttal testimony, concerned proof of a reduction to practice of a clip of the type of exhibits 1 and 4.

The evidence purporting to show a reduction to practice of a clip of the type of exhibits 1 and 4 indicates that the major problem in developing a satisfactory clip was to develop a rubber member having certain required properties. The testimony of all witnesses indicates that a number of varieties of rubber were used which were unsatisfactory before a satisfactory sponge rubber member was developed. The board, after detailed analysis of the testimony, stated:

"We are of the opinion that the testimony establishes that the clip of the type represented by Meulenberg *et al.* Exhibits 1 and 4 was conceived and was found to be satisfactory enough, so that the Automotive Rubber Co. assisted by Chrysler felt justified in spending time and money for the development of an automatic machine to make this clip. This happened in the winter of 1949,

at the time of the Chrysler strike, which started in January 1950 and lasted 106 or 108 days. The strike was still going on in March 1950. The events testified to, took place in Detroit. We take judicial notice of fact that in Detroit it is still wintry in March. * * * "

and the board held:

"We are of the opinion that the testimony of Funkhouser and Koza prove conception and reduction to practice of the clip of Meulenberg *et al.* Exhibits 1 and 4 in the winter of 1949 which period the witnesses intended to include March 1950. * * * "

This holding was adhered to without further comment on reconsideration.

■ We have carefully studied the evidence presented by the junior party and conclude that the board was correct, for the reasons stated in its opinion, in finding that the junior party's proofs do establish, by a preponderance of the evidence, a reduction to practice of the clip, (Meulenberg and Redmond's exhibits 1 and 4) prior to the senior party's filing date. We think such a clip meets the requirements of count 5. While it may be argued that the "winter in 1949" does not necessarily include March of 1950, we think the board correctly found that a reduction to practice did occur sometime in March 1950. We hold, therefore, that the legal effect of the testimony is to establish a reduction to practice as of March 31, 1950 of a clip satisfying count 5. Cf. Connor v. Williams, 1878 C.D. 137.

(3) DOES THE TESTIMONY OF SCOTT ESTABLISH A REDUCTION TO PRACTICE OF A CLIP SATISFYING THE REQUIREMENTS OF COUNT 5 PRIOR TO MARCH 31, 1950?

In its decision on reconsideration, the board found that Scott's testimony did

---

7. Count 2 requires the body of thermoplastic material to lie "substantially in the plane of the border frame." Count 5 is broader and does not mention the plane of the border frame. We do not think, as did the board, that "surround" requires this limitation of count 2 to be read into count 5.

not prove a reduction to practice prior to his filing date of April 13, 1950. Since diligence is not here an issue, the sole question on this issue is whether the proofs on behalf of Scott satisfactorily establish a reduction to practice prior to March 31, 1950, the effective date of reduction to practice for the junior party.

The testimony on behalf of the senior party indicates that Scott, a Product Engineer for the Gagnier Products Company, conceived the invention at least as early as February 1950. An experimental mold, Scott exhibit A, was made by the Detroit Development Company for Scott prior to February 1950. This mold, a "test pan" (Scott exhibit C) and a molded clip (Scott exhibit CA) were given to personnel at the Armada Rubber Company who were to give Gagnier Products Company an estimate for molding rubber on a Gagnier clip #994 using the mold, Scott exhibit A. The testimony of witnesses Weymouth and Konyha indicates that the clips and the mold were received from Scott prior to February 1950. Konyha testified that he actually molded rubber on a Gagnier clip as follows:

"Q25. Did you personally make any clips with sealing bodies attached to them in that particular mold of Exhibit A? Yes, I did.

"Q26. Do you recall about what time you did that? A. In January of 1950. I don't recall the exact date."

Scott's exhibit D is a letter from the Armada Rubber Co. to Scott, dated Feb. 2, 1950, giving a quotation for production costs of producing a molded clip. Witness Weymouth stated that the work referred to in this letter would produce clips similar to the clip of Scott exhibit CA. This testimony was as follows:

"Q23. Now, I show you a device marked for purposes of identification Scott Exhibit C. Could you tell

me where that came from? A. Well, Mr. Scott gave it to me, and, of course, to show me what he was attempting to do and what it was for.

\* \* \* \* \* \*

"Q28. I show you a letter marked for purposes of identification Scott Exhibit D. Could you identify that letter? A. Yes. It has my signature on it, and, of course, was the quotation which I gave Mr. Scott, following some of this preliminary work, on producing actual production parts of the same nature.

"Q29. What is the date of that letter? A. February 2, 1950.

\* \* \* \* \* \*

"Q32. Would that be the manner in which the rubber is molded as shown in Exhibit C?[8] A. Yes, it would be."

It is the senior party's position that this molded clip of exhibit CA, made by Scott and given to Armada Rubber Company personnel prior to February 2, 1950, is a reduction to practice of a clip satisfying the requirements of count 5. This position is stated in Scott's brief as follows:

"This sealing fastener of Exhibit CA is a clear reduction to practice of the invention which was made by Scott prior to January, 1950 as corroborated by both Weymouth and Konya, [sic] and which has been out of the possession of Scott in storage at Armada Rubber Company at least since January, 1950.

\* \* \* \* \* \*

"Armada furnished their samples of the complete clip and seal assembly to Scott \* \* \*, and these were satisfactory for the purpose \* \* \*, which is why the quotation of Exhibit D was made, and which is proof of reduction to practice of the fastener of Exhibit CA."

8. At an early stage on the Scott testimony, exhibit C consisted of a test pan and a molded clip inserted in a hole in the pan. This clip was later removed from the pan and separately designated as Scott exhibit CA.

The board, in its opinion on reconsideration, stated that the molded clip of exhibit CA was not a satisfactory reduction to practice since there was no proof offered by the party Scott that this molded clip was ever satisfactorily water tested in the test pan, exhibit C. The testimony of Scott and Konyha concerning the water tests is as follows:

"Q21. Did you ever test any of the fasteners with the attached sealing bodies made in this mold? A. Oh, yes. Yes, we tested any number of them.

"Q22. What kind of tests would you do? A. Well, that was something that was left more or less to us, in that we were the originator of the seal, and the test, to our satisfaction, at least, in our plant involved the making of test plates and test pans which would simulate the use of the fastener within the scope of industry.

\* \* \* \* \* \*

"Q24. Do you recall the approximate dates of these tests which you made on devices made with this mold?

\* \* \* \* \* \*

"A. Well, they would have to fall between December of 1948 and March of 1949. It continued on actually as a demonstration to an indefinite period thereafter.

\* \* \* \* \* \*

"XQ41. Did you ever personally see any water put in the pan, Exhibit C? A. Yes, I did.

"XQ42. In what way? A. The metal clip was placed in the hole, water was placed in there, and then it was checked on the opposite side to see if any could leak through.

"XQ43. You would have two metal clips, I presume? A. Yes, that's right.

"XQ44. And the only pressure would be the pressure of the water in the pan? A. That is correct."

The board noted that neither witness was asked on direct or cross-examination about the results of the water test. Witness Weymouth testified about these tests as follows:

"XQ81. You yourself never inserted any of these clips into a hole like shown in Exhibit C? A. Oh, I probably put it in and out several times, yes, but I mean that wasn't my job.

"XQ82. When you did put them in and out several times, did you notice whether or not the clip was always flush with the surface of the metal? A. No, I couldn't say whether I—. As a molding, they would have to be flush with the top of the metal in the particular molds.

"XQ83. Did you yourself make any tests in any way similar to Exhibit C to see about the leakage? A. No. We might have put them in that particular piece of metal and tried them out, but I mean it wasn't our job, as such."

It is to be particularly noted the above-quoted testimony of three witnesses for Scott gives us no indication of the results of the water tests applied to Scott's molded clip exhibit CA. This omission becomes of critical significance in view of the junior party's rebuttal testimony which seems to indicate clearly that the clip CA having a sealing portion of relatively hard rubber was not satisfactory. Witness Sturtevant, a "body engineer" with the Chrysler Corporation, testified as follows:

"Q18. Would you say Exhibit CA would be satisfactory and soft enough to use as a molding clip? A. No, sir, it would not. I am certain it would never function properly. It looks like it has been installed and removed."

Witness Brauburger, another Chrysler engineer, testified as follows:

"Q18. Have you tested clips of the type Exhibit 10 and Exhibit CA of a hard rubber? A. Yes.

"Q19. And what results did you find? A. They didn't seal. They are too hard.

"Q20. How did you know they didn't seal? A. Well, the way we tested them, we put them in the molding, put the molding on the body of the car, then get inside the car and put the car in the water test and sit in there with a flashlight and watch for leaks, and that was the method.

"Q21. Then would you say whether or not Exhibits CA or 10 were soft enough to act as a satisfactory molding clip? A. In my opinion, they would not be."

In view of the above-quoted testimony, it seems clear to us that the board was correct in its conclusion that a mold clip of rubber with specifications of "506 AP", which the testimony indicates is considerably harder than sponge rubber, is not a satisfactory clip from the standpoint of completely sealing the holes through which the clip legs are inserted. As noted above, the proofs of Scott are silent on this matter of water tests while the rebuttal testimony of Meulenberg and Redmond quoted above indicates to us that the hard rubber clip of Scott exhibit CA was not satisfactory. The only refutation of this rebuttal testimony is found in counsel's argument in his brief on behalf of Scott that:

"Exhibit CA satisfies every element of Count 5 herein, and there is no doubt that the rubber body molded to the juncture of the shank and the head of the Gagnier #994 fastener here is soft and deformable enough for sealing. The unit is now at least ten years old and in spite of some possible hardening by aging it is almost as soft to the touch as the Meulenberg et al Exhibit 1. The pan of Exhibit C with fastener CA in place will hold water today. This is the type of exhibit that needs no exhaustive tests to prove a reduction to practice. It either seals the hole or it does not, and this can be ascertained by inspection of the test pan. * * *"

Such an argument of counsel is not sufficient to overcome the testimony given by the two Chrysler engineers nor to explain away the unsatisfactory water test results to which they referred in their testimony.

We note that count 5 defines the rubber base as "a resilient body of soft deformable material". While it may be said any rubber is a "soft deformable material" relative to metal, it is common knowledge that rubber has many degrees of hardness and thus many different degrees of resistance to deformation. We think, therefore, that in order to establish satisfactorily an actual reduction to practice of a clip satisfying the requirements of count 5, this requirement means that the rubber must not only be sufficiently soft and deformable to enter the hole but that it must also be capable of maintaining *sealing engagement* with "the marginal edges of the opening through which the shank is adapted to project." The importance of providing a leakproof sealing engagement is stressed in the specification of Scott's patent as follows:

"In this connection, however, a severe problem has been encountered in that a bad leak is created by the presence of the hole whereby water can reach interior appointments as well as interior metal surfaces which have not been protected against external corrosive influence. Attempts have been made to stop such leaks by the use of soft rubber gaskets, but difficulty has been experienced in fitting gaskets properly to the odd shapes which are characteristic of this type of fastener. * * *

"It is therefore an object of this invention to provide a fastener of the type described which has the inherent characteristic of preventing leaks at points where it is installed."

It seems strange in view of the rebuttal testimony for Meulenberg and Redmond and with the knowledge of the sealing requirements that the testimony on behalf of Scott indicates no more than that the rubber used in Scott's clip of exhibit CA permitted insertion of the clip in the

test pan. Beyond that we are left entirely to conjecture as to whether the rubber in exhibit CA was sufficiently soft and deformable to make a satisfactory seal as required by count 5. We find, therefore, that the board was correct in finding that the testimony on behalf of Scott does not prove a reduction to practice of the clip satisfying count 5 prior to his filing date.

In summary, we find and hold that counts 1 to 4 do not read upon Meulenberg and Redmond's exhibits 1 and 4 and *affirm* the board in awarding priority of these counts to the senior party Scott. We find and hold that count 5 reads upon Meulenberg and Redmond exhibits 1 and 4 and therefore *reverse* the board in holding that it does not. We find further that the junior party's proofs establish a reduction to practice as of March 31, 1950 of a device meeting the terms of count 5 and that the senior party has failed to establish an actual reduction to practice of the invention claimed in count 5 prior to March 31, 1950. We therefore reverse the board in its award of priority of count 5 to Scott.

We find that the additional matter certified to the court as part of the record by appellee was necessary to a proper determination of this appeal. Therefore, the costs of printing this material are taxed against appellant.

Modified.

MARTIN, Judge, did not sit or participate in decision.

WORLEY, Chief Judge (dissenting).

I agree with the majority regarding counts 1 through 4, but do not agree that count 5 reads on the Meulenberg and Redmond Exhibits 1 and 4.

Count 5 requires " * * * a resilient body of soft deformable plastic material having a base *surrounded* by said border frame * * *." (Italics supplied)

The board interpreted that language as follows:

" * * * These exhibits do not satisfy 'the language of the counts'

* * * because these exhibits do not satisfy the limitation of the count 'having a base *surrounded* by said border frame'. To surround, requires enclosing completely, encircling, or encompassing. Partially doing so is not 'surrounding'."

I can find no error in that reasoning or conclusion.